## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**STUART SHAUL,**

      **Plaintiff,**

**v.**                                                  **Case No. 2:12-cv-539-FtM-DNF**

**COMMISSIONER OF SOCIAL
SECURITY,**[1]

      **Defendant,**

_____/

### OPINION AND ORDER

This cause is before the Court on Plaintiff's Complaint (Doc. 1) filed on October 2, 2012. Plaintiff, Stuart Shaul seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his claim for Social Security Disability Insurance Benefits. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions. For the reasons set out herein, the decision of the Commissioner is **AFFIRMED** pursuant to §205(g) of the Social Security Act, 42 U.S.C. §405(g).

**I.  Social Security Act Eligibility, the ALJ Decision and Standard of Review**

**A. Eligibility**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. FED. R. CIV. P. 25(d). No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

months. 42 U.S.C. §§416(i), 423(d)(1)(A), 1382a(3)(A); 20 C.F.R. §§404.1505, 416.905.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. §§423(d)(2), 1382a(3); 20 C.F.R. §§404.1505 - 404.1511, 416.905 - 416.911.  Plaintiff bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

### B.  Procedural History

On February 6, 2009, Plaintiff filed an application for Disability Insurance Benefits asserting a disability onset date of February 5, 2004. (Tr. 82-88).   These claims were denied initially on May 12, 2009, and denied upon reconsideration on June 30, 2009. (Tr. 67-70, 73-75).  A hearing was held before Administrative Law Judge, Larry J. Butler (hereinafter "ALJ") on September 28, 2010, and the ALJ issued an unfavorable decision on November 18, 2010. (Tr. 18-32).  On August 21, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 1-3).  Thus, the ALJ's decision is the final decision of the Commissioner of Social Security in the present case. Plaintiff now seeks judicial review of the ALJ's decision in the United States District Court for the Middle District of Florida.

### C.  Summary of the ALJ's Decision

The ALJ found that Plaintiff met the Social Security Act's insured status requirements through December 31, 2009. (Tr. 23).  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of February 5, 2004, through his date last insured of December 31, 2009. (Tr.

23).  At step two, the ALJ found that the plaintiff suffered from the following severe impairments: "congenital transposition of great vessels status post correction as a child; arrhythmias with complete heart block and pacemaker placement; atrial fibrillation; hypertension; hyperlipidemia; history of transient ischemic attacks; plantar fasciitis in left foot; and heel spur syndrome in left foot." (Tr. 23).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (Tr. 24).  The ALJ found that Plaintiff's symptoms and the medical evidence did not establish an impairment of listing level severity. (Tr. 24).  Specifically, the ALJ considered Plaintiff's heel spurs and plantar fasciitis and concluded that those conditions did not satisfy the severity requirements of any listed impairment. (Tr. 24).

At step four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform a wide range of light work except that Plaintiff should avoid concentrated exposure to extreme cold and heat, humidity, and atmospheric conditions such as fumes, odors, dusts, and gasses and should avoid even moderate exposure to hazards such as machinery and heights. (Tr. 25).  The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ did not find the Plaintiff's claims concerning the intensity, persistence, and limiting effects of these symptoms were credible because they were inconsistent with the above RFC and medical evidence of record. (Tr. 25).  Thus, at step four, the ALJ found the Plaintiff is not able to perform his past relevant work as a line erector, which is classified as skilled at a heavy exertional level. However, the ALJ found that Plaintiff is able to perform work at a light exertional level with minimal non-exertional limitations. (Tr. 27)

At step five the ALJ determined, considering the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed pursuant to 20 C.F.R. §§ 404.1569, 404.1569(a). (Tr. 27). Therefore, the ALJ found that a finding of "not disabled" was appropriate under the framework of Medical-Vocational Rule 202.21 and Rule 202.14. (Tr. 28).

**D. Standard of Review**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standard, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; accord, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II. Review of Facts and Conclusions of Law

### A.  Background Facts

Plaintiff was born on March 30, 1956, and was fifty-two (52) years old on the date of the hearing. (Tr. 38).  He has at least a high school education. (Tr. 27).  He resides with his wife who is employed part-time. (Tr. 52).  Plaintiff was employed by Consolidated Edison as a lineman for twenty-nine (29) years, which involved stringing lines on the top of electric poles. (Tr. 38).  After leaving Consolidated Edison due to his alleged disability Plaintiff moved to Florida where he currently resides. (Tr. 38).

Plaintiff testified that he stopped working on February 5, 2004, due to dizziness, fatigue, confusion, and the inability to stand on his feet for any moderate period of time. (Tr. 39, 42). Plaintiff alleges that he has been diagnosed with reversed transposition of the great vessels, a rare condition in which blood flow is reversed and goes through the valves the opposite direction. (Tr. 41).  Plaintiff claims he was born with this disorder and was made aware of it at age fourteen (14). (Tr. 41).  Plaintiff also was equipped with a pacemaker on January 9, 2002, due to his recurring cardiovascular problems and blockages. (Tr. 191).  Plaintiff claims that following the pacemaker his strength declined. (Tr. 40).  Plaintiff also claims to have atrial fibrillation, which causes his heart to flutter when he is engaged in physical labor—causing Plaintiff to become dizzy and tired, resulting in a need to nap. (Tr. 43).  Plaintiff testified that in a six-month period he had twelve to fourteen (12-14) episodes regarding this atrial fibrillation. (Tr. 44).  Plaintiff testified that his disabilities limit his daily functions due to the need to relax in order to prevent becoming dizzy and tired. (Tr. 49).

Plaintiff also testified that he has constant foot pain in his arches, bridges, and heels. (Tr. 45).  This was later diagnosed as plantar fasciitis and treated with physical therapy and sports

wraps but the relief is only temporary. (Tr. 46).  Plaintiff alleges that the foot pain is a contributing factor to his inability to work, as he claims he can only stand on his feet for twenty (20) minutes. (Tr. 46).

Plaintiff was admitted in the hospital on May 29, 2007, where they diagnosed a "possible transient ischemic attack (TIA)." (Tr. 202).  Plaintiff thereafter refers to the incident as having a "stroke" throughout the record. (Tr. 39, 40).  Following the alleged stroke Plaintiff testified that he lost his speech—going a year without being able to complete sentences. (Tr. 40).  Plaintiff also claimed to have trouble finding words, making judgments, and finding ambition following the stroke. (Tr. 40).  Plaintiff asserts that after his stroke he began having migraine headaches.  (Tr. 48).

Plaintiff takes care of his personal needs. (Tr. 49, 111).  Plaintiff testified that he engages in chores around the house, as well as doing a bit of landscaping and going food shopping. (Tr. 43, 46).  Plaintiff also drives, although not as much as he used to. (Tr. 52).  On a typical day, Plaintiff wakes up, does things around the house, becomes tired and relaxes, and then rises and continues basic house chores before dinner. (Tr. 49).

### B.  Summary of Medical Evidence

Plaintiff included a small amount of medical evidence from years prior to his onset date. The Court reviewed all of the medical evidence provided by Plaintiff and will include a brief summary of some of the medical evidence for the years prior to the onset date of February 5, 2004. During the period of January 8, 2002, to January 10, 2002, Plaintiff was admitted to St. Francis Hospital in Roslyn, New York to conduct cardiovascular studies. (Tr. 179).  Electrophysiologic studies were performed, which revealed conduction abnormalities and AV block at which time Plaintiff was referred for pacemaker implementation. (Tr. 180).  A bipolar pacemaker was put into

place unremarkably and it was noted that a dual chamber pacemaker was warranted and justified in the future. (Tr. 190).  On January 10, 2002, Plaintiff was discharged in stable condition. (Tr. 180).

On August 27, 2004, Plaintiff visited Ricardo Martinez, M.D. to establish a local cardiologist. (Tr. 391).  Plaintiff disclosed his history of congenital heart disease and was examined. (Tr. 391).  Plaintiff denied any chest pain or shortness of breath and his heart rhythm was noted by Dr. Martinez to be regular. (Tr. 391-392)  An echocardiogram was performed leaving Dr. Martinez with the impression that Plaintiff has congenitally corrected transposition of the great vessels. (Tr. 411).  Dr. Martinez noted that overall Plaintiff appeared to be doing very well. (Tr. 392).

Plaintiff again visited Dr. Martinez on October 5, 2004, for a check-up. (Tr. 388-89, 450-51).  Plaintiff reported generally feeling very well with no chest pain or shortness of breath. (Tr. 388-89, 450-51).  Following the evaluation Dr. Martinez recommended Plaintiff proceed with a cardiolite stress test. (Tr. 388-89, 450-51).  Plaintiff followed up with Dr. Martinez on October 25, 2004, for cardiolite stress testing. (Tr. 387, 449).  Plaintiff walked for 12 minutes and was tested for cardiolite methods and a stress impression. (Tr. 387, 449).  Plaintiff had no symptoms of chest pain, tightness, or pressure and had a normal heart rate and blood pressure response to exercise. (Tr. 387, 449).  The cardiolite impression was also noted by Dr. Martinez to be normal with no evidence for ischemia. (Tr. 387, 449).  Plaintiff also demonstrated "excellent functional capacity." (Tr. 387, 449).

On October 3, 2005, Plaintiff visited Patrick Chernesky, D.P.M. after stepping on an object and injuring his left heel. (Tr. 279-81).  The tentative diagnosis was foreign object trauma and

plantar fasciitis with heel pain in the left heel. (Tr. 279-81).  Dr. Chernesky ordered a small surgical dissection of the heel fragments which was done on October 4, 2005. (Tr. 290).

Plaintiff visited Dr. Martinez on November 16, 2005, for a follow up following a recent echocardiogram. (Tr. 410, 441).  Dr. Martin's impressions were that Plaintiff had congenitally corrected transposition of the great vessels, congenital right ventricle demonstrating normal function and mild hypertrophy, and the functioning mitral valve or congenital tricuspid valve demonstrated mild regurgitation. (Tr. 410, 441).

Plaintiff visited Dr. Martinez on March 17 and October 23, 2007, for general check-ups. (Tr. 382-83, 360-61).  At both visits, Plaintiff presented no complaints and denied chest pain and shortness of breath. (Tr. 382-83, 360-61).  For both visits Dr. Martinez ordered Plaintiff to maintain his current medication plan. (Tr. 382-83, 360-61).

On May 29, 2007, Plaintiff was admitted to Charlotte Regional Medical Center with facial numbness and speech disturbance. (Tr. 193-94).   Initial diagnoses indicated a possible stroke or transient ischemic attack. (Tr. 193-94).  After a number of tests were performed, the final diagnosis was a possible transient ischemic attack. (Tr. 193-94, 202, 214-15, 377-78).  A cerebrovascular accident, or stroke, was ruled out. (Tr. 193-94, 202, 214-15, 377-78).  On May 30, 2007, Plaintiff visited Charlotte Regional Medical Center to have a number of tests conducted in regard to his slurred speech, facial numbness, and tingling. (Tr. 207, 216, 219).  The results of the tests were unremarkable other than cardiovascular notations previously reported such as Plaintiff's pacemaker. (Tr. 207, 216, 219).  On June 1, 2007, Plaintiff visited Dr. Martinez for a consultation regarding his possible transient ischemic attack. (Tr. 211-13, 371-72, 399-400, 465-66).   Dr. Martinez noted that Plaintiff appeared to be a healthy male in no acute distress. (Tr. 211-13, 371-72, 399-400, 465-66).  It was assessed that Plaintiff had congenitally corrected transposition of the

great vessels with history of AV block. (Tr. 211-13, 371-72, 399-400, 465-66). Dr. Martinez ordered that Plaintiff undergo an echocardiogram as well as a carotid duplex. (Tr. 211-13, 371-72, 399-400, 465-66). On June 3, 2007, Clifford Greenberg, M.D. drafted a discharge report in which he ruled out the possibility of Plaintiff suffering a cerebrovascular accident and stated that Plaintiff's symptoms had completely resolved. (Tr. 202-04).

Plaintiff followed up with Dr. Martinez on June 13, 2007, and June 16, 2007, where tests were completed showing that Plaintiff's heart was operating within mostly normal limits with the exception of mild to moderate regurgitation of the anatomic mitral valve. (Tr. 205, 209-10, 374-76, 404-06, 459-61). On November 5, 2007, Plaintiff visited Dr. Martinez for a check-up. (Tr. 344-45, 339-40, 344, 355-56). Dr. Martinez noted that Plaintiff had atrial fibrillation following his hospital visit for a possible transient ischemic attack. (Tr. 344-45, 339-40, 344, 355-56). In the report Dr. Martinez noted that Plaintiff has started on Coumadin and has been doing very well and is without any complaints. (Tr. 344-45, 339-40, 344, 355-56).

On February 2, 2008, Plaintiff again visited Dr. Chernesky, with complaints of pain in his left heel ranging from five to eight out of ten (5-8/10) on a pain scale and causing him to limp when pain increases. (Tr. 283-84, 295-96). Plaintiff was prescribed physical therapy for the left heel three (3) times a week for three (3) months. (Tr. 283-84, 295-96). Plaintiff occasionally attended physical therapy from February 8, 2008, until November 5, 2009, and was not able to resolve his heel pain. (Tr. 292, 513-530, 534-43). Plaintiff would enter the appointments with a pain scale usually ranging from five to eight out of ten (5-8/10) and would leave the appointment reporting reduced pain. (Tr. 292, 513-530, 534-43). However, Plaintiff reported the pain was only relieved temporarily and would always return in the following days. (Tr. 292, 513-530, 534-43).

On April 23, 2008, at the request of Dr. Chernesky, Plaintiff underwent a CT scan of the left heel. (Tr. 265-66, 282, 288-89).  The results showed there was a calcified heel spur and soft tissue swelling at the level of plantar aponeurosis consistent with presumably plantar fasciitis, both acute and chronic components. (Tr. 265-66, 282, 288-89).

Plaintiff visited Dr. Martinez on October 27, 2008, for a follow-up of his atrial fibrillation, hypertension, and hyperlipidemia. (Tr. 324-25, 349-50, 420-21).  Dr. Martinez reported that Plaintiff was doing very well with exercise but recommended a cardiac stress test. (Tr. 324-25, 349-50, 420-21). The cardiolite stress testing took place on October 31, 2008. (Tr. 348-418). Results showed that Plaintiff had a normal heart rate and blood pressure response to the tests with the EKG showing no acute changes. (Tr. 348-418).

On May 20, 2009, Plaintiff visited Dr. Martinez for a follow-up with complaints of lightheadedness since his stroke. . (Tr. 319-20).  Dr. Martinez noted that Plaintiff's heart rate has been elevated but overall Plaintiff was doing well on the Coumadin and exercise. (Tr. 319-20). On May 26, 2009. Dr. Martinez wrote a letter containing his opinion on Plaintiff's disability status. (Tr. 317-18).  Dr. Martinez noted that Plaintiff had done well following his pacemaker implant in 2002 but had begun to decline following his transient ischemic attack in 2007. (Tr. 317-18). Shortly thereafter, Dr. Martinez reported that Plaintiff had developed permanent atrial fibrillation and was prescribed Coumadin to reduce the recurrence of another transient ischemic attack. (Tr. 317-18).  Dr. Martinez reported that Plaintiff has done well functionally with the Coumadin through 2008. (Tr. 317-18).  However, Dr. Martinez reported that during Plaintiffs visit on May 20, 2009, he seemed severely depressed, which was likely the cause of Plaintiff's fatigue and lightheadedness. (Tr. 317-18).  It was also a concern of Dr. Martinez's that Plaintiff's ventricular rhythm may become elevated with exercise, which prompted the initiation of a beta blocker. (Tr.

317-18).  Dr. Martinez concluded the letter by stating that Plaintiff's heart status had not changed in the five years of their relationship. (Tr. 317-18).

In a letter dated May 28, 2009, Dr. Chernesky stated that Plaintiff has had foot pain for years and has had injections, inserts, and proper shoes without any considerable results. (Tr. 264, 274, 494).  Dr. Chernesky also opined that Plaintiff cannot stand on his feet for longer than thirty to forty-five (30-45) minutes without pain and the need to sit down and rest. (Tr. 264, 274, 494). Dr. Chernesky diagnosed Plaintiff with plantar fasciitis and heel spur syndrome in his left foot. (Tr. 264, 274, 494).  It was reported that Plaintiff did not wish to have surgical intervention at that time. (Tr. 264, 274, 494). Lastly, Dr. Chernesky opined that he feels Plaintiff is unable to work even a part time job if it involves standing on his feet. (Tr. 264, 274, 494).

On June 5, 2009, Plaintiff visited Dr. Chernesky with complaints of pain in his right foot around the heel and arch. (Tr. 493, 532-34).  Plaintiff also reported the usual pain in the left foot, but at that time the pain in the right foot was much worse. (Tr. 493, 532-34).  Dr. Chernesky noted that there was no swelling and both feet looked normal. (Tr. 493, 532-34).  Physical therapy was prescribed but over the course of several months there was no considerable relief of the pain. (Tr. 534-43).

On March 5, 2010, Plaintiff was admitted to Charlotte Regional Medical Center for a pulse generator change out. (Tr. 496-99).  Plaintiff underwent surgery to implant a new dual-chamber pacemaker. (Tr. 496-99).  On June 2, 2010, Plaintiff visited Janet M. Tobin, M.D. for a follow-up visit. (Tr. 501-02).  Plaintiff denied any chest pain, tightness, or discomfort. (Tr. 501-02).  Plaintiff was ordered to continue with his current medical management as prescribed and to follow up in six months. (Tr. 501-02).

### C.  State Agency Evaluations

-11-

On April 14, 2009, Pascal Bordy M.D. completed an Internal Medicine Consultative Examination for the Office of Disability Determination Services. (Tr. 232-36).  Dr. Bordy noted that Plaintiff appeared to be a well-developed and well-nourished male who was in no distress. (Tr. 233).  Plaintiff complained of fatigue following his transient ischemic attack as well as pain in both of his feet while standing. (Tr. 233).  Dr. Bordy reported that Plaintiff had no weakness in the face, upper extremities, or lower extremities following his transient ischemic attack. (Tr. 233). Plaintiff's speech also appeared to be unaffected. (Tr. 233).  Plaintiff also denied depression at the time of the visit. (Tr. 233).  Dr. Bordy noted that Plaintiff had no difficulty standing from a seated position and walked comfortably around the room without limping or the assistance of a cane. (Tr. 233).  Following a mental examination Dr. Bordy noted Plaintiff's orientation, memory, appearance, behavior, and ability to relate were entirely within normal limits. (Tr. 235).  Plaintiff's affect was also normal without signs of depressive disorders and without signs of agitation, irritability, or anxiety. Dr. Bordy's clinical impressions were as follows: 1) congenital transposition of great vessels, 2) arrythmias, complete heart block with pacemaker placement in 2003, 3) atrial fibrillation, 4) hypertension, 5) hyperlipidemia, 6) history of TIA, 7) calcaneal spurs. (Tr. 236).  Dr. Bordy concluded that Plaintiff is responsible to handle funds in his own interest. (Tr. 236).

On April 22, 2009, Meredith Seckendorf Ed.D. completed a General Clinical Evaluation for the Office of Social Security Disability Determinations. (Tr. 248-49).  Following a mental status exam Dr. Seckendorf noted that Plaintiff evidenced depressed mood and flat affect but did appear to have upper average intelligence, intact long term memory, adequate attention, and variable concentration. (Tr. 248-49).  Dr. Seckendorf's diagnostic impression was that Plaintiff

had adjustment disorder with mixed anxiety and depressed mood due to a medical condition. (Tr. 248-49).  However, the prognosis was guarded due to Plaintiff's medical condition. (Tr. 249).

On May 5, 2009, a Physical Residual Functional Capacity Assessment was completed by Crystal Holmes. (Tr. 240-47).  Ms. Holmes determined that Plaintiff could lift twenty (20) pounds occasionally, ten pounds frequently, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was unlimited in the push and/or pull operation for hand and/or foot controls. (Tr. 240-47).  Ms. Holmes found Plaintiff to have no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 240-47).

On May 7, 2009, Sharon Ames-Dennard Ph.D. completed a Psychiatric Review Technique. (Tr. 250-63).  Dr. Ames-Dennard determined that Plaintiff's impairments were categorized as affective disorders but were not severe. (Tr. 250).  Dr. Ames-Dennard listed Plaintiff's impairment as an adjustment disorder with mixed anxiety and depressed moods due to medication. (Tr. 253). On the functional limitations portion of the exam, Dr. Ames-Dennard determined Plaintiff had no restrictions in daily activities, maintaining concentration, or episodes of decompensation. (Tr. 260).  However, Dr. Ames-Dennard listed Plaintiff's functional limitation with regard to difficulties in maintaining social functioning as mild. (Tr. 260).  In conclusion, Dr. Ames-Dennard opined that Plaintiff's impairment is non-severe and is not preventing him from participating in substantial gainful activity. (Tr. 262).

On June 24, 2009, J. Patrick Peterson, Ph.D., J.D. Completed a Psychiatric Review Technique on Plaintiff. (Tr. 476-89).  Dr. Peterson determined that Plaintiff's impairments were categorized as affective disorders but were not severe. (Tr. 476).  Dr. Peterson listed Plaintiff's impairment as an adjustment disorder with mixed anxiety and depressed mood. (Tr. 479).  On the functional limitations portion of the exam Dr. Peterson determined Plaintiff had no restriction in

daily activities, maintaining social functioning, or episodes of decompensation. (Tr. 486). However, Peterson listed Plaintiff's functional limitation with regard to difficulties in maintaining concentration, persistence, or pace as mild. (Tr. 488).  Dr. Peterson opined that Plaintiff possesses adequate mental functioning and some depression due to his physical health limits. (Tr. 488).  In conclusion, Dr. Peterson determined that Plaintiff seemed somewhat depressed but had no severe mental functional limitations. (Tr. 488).

On June 29, 2009, a Physical Residual Functional Capacity Assessment was completed by Minal Krishnamurthy, M.D. (Tr. 468-75).  Dr. Krishnamurthy determined that Plaintiff could lift twenty (20) pounds occasionally, ten (10) pounds frequently, stand and/or walk for six (6) hours in an eight (8) hour work day, and was unlimited in the push and/or pull operation for hand and/or foot controls. (Tr. 469).  Dr. Krishnamurthy supported this conclusion with evidence that Plaintiff has reported to be doing well with exercise and denied shortness of breath or dyspnea on exertion. (Tr. 469-70).  Plaintiff also had a stress test with no evidence of ischemia. (Tr. 469-70).  Dr. Krishnamurthy found that Plaintiff's only postural limitation is that he may only occasionally climb ladders, rope, and scaffolds. (Tr. 470).  Dr. Krishnamurthy determined that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gasses, and poor ventilation. (Tr. 472).  However, Plaintiff is found able to handle unlimited exposure to wetness, noise, and vibration. (Tr. 472).

**D.  Specific Issues**

Plaintiff raises two issues on appeal. As stated by Plaintiff, they are: (1) the ALJ failed to properly apply the Eleventh Circuit three-part pain standard in evaluating the Plaintiff's complaint of migraine headaches; and (2) the ALJ failed to consider the specialty of the doctors providing medical opinion evidence and give appropriate weight to the opinion of the treating physician.

1.   **Determination of Plaintiff's Credibility and the ALJ's Consideration of Plaintiff's Complaints of Migraine Headaches**

In evaluating Plaintiff's complaints of migraine headaches, Plaintiff asserts that the ALJ failed to properly apply the Eleventh Circuit three-part pain standard, which applies whenever a claimant asserts disability through testimony of pain or other symptoms,. (Doc. 21 p. 5).  Plaintiff claims that while the ALJ is not required to accept the claims of Plaintiff for disability benefits as to the frequency and severity of symptoms, the ALJ is required to make a credibility determination. (Doc. 21 p. 6).  Plaintiff asserts that no such determination was made regarding Plaintiff's complaints of migraine headaches and therefore this cause should be reversed and remanded. (Doc. 21 p. 7).  The Commissioner responds that the ALJ did address the migraine complaint and made no error in his determination of Plaintiff's credibility. (Doc. 22 p. 5).

The Eleventh Circuit three-part pain standard that applies whenever a claimant asserts disability through testimony of pain or other subjective symptoms requires (1) evidence of an underlying medical condition and either (2) objective medical evidence confirming the severity of the alleged pain arising from that condition, or (3) that the objectively determined medical condition is of such a severity that it can be reasonably be expected to cause the alleged pain. *Foote v. Charter*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Kelly v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999).  After considering claimant's subjective complaints, the ALJ may reject them as not credible, and that determination may be reviewed for substantial evidence. *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992).  If the objective medical evidence does not confirm the severity of the alleged symptoms, but indicates that the claimant's impairment could reasonably be expected to produce some degree of pain and other symptoms, the ALJ evaluates the intensity and persistence of the claimant's symptoms and their effect on his ability to work by considering the

objective medical evidence, the claimant's daily activates, treatment and medications received, and other factors concerning functional limitations and restrictions due to pain. *See* 20 C.F.R. § 404.1529.

In the instant case, Plaintiff's complaints of frequent migraine headaches were properly considered by the ALJ in his determination of Plaintiff's credibility. Plaintiff did state that following his transient ischemic attack he began to get migraines more frequently, occurring a few times a week and sometimes lasting all day. (Tr. 48-49).  In a consultative psychological evaluation on April 22, 2009, Plaintiff stated that he had migraine headaches once to twice a week. (Tr. 248). Plaintiff contends that the ALJ did not make a credibility determination regarding these complaints, however the ALJ did make such a determination. (Tr. 25).  Immediately following discussion of Plaintiff's migraines in his opinion, the ALJ found that Plaintiff's statements were not entirely credible as they were unsupported by objective medical evidence such as Dr. Krishnamurthy's residual functional capacity assessment. (Tr. 25, 468-75).  Furthermore, the ALJ continued to substantiate his determination by listing medical evidence throughout the record citing Plaintiff's lack of complaints to treating physicians regarding his migraine headaches, as well as reports from Dr. Martinez that Plaintiff was doing very well and demonstrated excellent functional capacity. (Tr. 25-26).

Therefore, Plaintiff's assertion that the ALJ failed to address the complaints of migraines is without merit. (Tr. 25).  Also, in making his credibility determination the ALJ considered the record as a whole and found that Plaintiff's subjective severity of his impairments is inconsistent with the medical records and medical evidence. *See* 20 C.F.R. § 404.1529.  Thus, the ALJ did not err in his application of the Eleventh Circuit three-part pain test as he reviewed all of the evidence

of record and weighed it in relation to Plaintiff's subjective complaints, ultimately finding they were inconsistent and therefore not credible.

### 2.   Consideration of the Weight Given to the Opinions of Treating Physicians

Plaintiff asserts that the ALJ failed to consider the specialty of the doctors providing medical opinion evidence and therefore did not give appropriate weight to the opinion of the treating physician. (Doc. 21 p. 7).  Plaintiff claims that the opinions of Dr. Chernesky, a podiatrist, who claims Plaintiff is not able to stand longer than forty-five 45 minutes or to work at a job even part-time if it requires standing, was improperly weighed by the ALJ who gave greater weight to Dr. Krishnamurthy, a non-examining, non-treating physician who does not specialize in the field of podiatry. (Doc. 21 p. 8).  Plaintiff also claims the ALJ erred in finding that Dr. Chernesky's opinion relies heavily on Plaintiff's subjective complaints and is inconsistent with the record as a whole. (Doc. 21 p. 8).  The Commissioner responds that the ALJ properly found Dr. Chernesky's opinion was not entitled to deference after finding good reasons that were supported by substantial evidence in the record. (Doc. 22 p. 7).

Both parties cite to 20 C.F.R. § 404.1527(c) which states the ALJ, in assigning weight to medical opinions, must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). Furthermore, the court must consider the following factors in determining the weight given to any medical opinion: the examining and treating relationships, evidence in support of a medical opinion, the consistency between a medical opinion and the record as a whole, and whether the opinion was given by a specialist in the field. *Id.*

Plaintiff asserts the ALJ erred by assigning little weight to Dr. Chernesky because his opinion was in fact supported by clinical and diagnostic evidence and the opinions are not based merely on subjective complaints nor contradicted by other substantial evidence. 20 C.F.R. §

404.1527(c)(2). Plaintiff claims this clinical and diagnostic evidence included Plaintiff having injections, shoe inserts, and proper footwear with no considerable results, as well as Dr. Chernesky's objective findings of plantar fasciitis and heel spurs. (Doc. 21 p. 8).   The Commissioner contends that the opinion of a treating physician "may be discounted when the opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c); SSR 96-2p; *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Phillip v. Barnhart*, 357 F.3d at 1240-41." (Doc. 17 at 11).

The Eleventh Circuit has held that the opinions of treating physicians should be given substantial weight; unless good cause exists to the contrary.  *Crawford*, 363 F.3d 1155, 1159 (11th Cir. 2004)(emphasis added).  "Good cause" to discount a treating physician's opinion exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Miller v. Barnhart, 182 Fed. App'x. 959, 963 (11th Cir. 2006) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004)).

In reaching his decision, the ALJ correctly reviewed all of the evidence on record and provided good reasons as to the weight he assigned the opinions of Dr. Chernesky.  The ALJ found that Dr. Chernesky's opinion was not entitled to deference due to the lack of relevant evidence supporting his opinion, its heavy reliance on Plaintiff's subjective complaints, and the inconsistency with the record as a whole. (Tr. 27).

The medical evidence of record supporting Plaintiff's complaints was the CT Scan taken in April 2008 finding a heel spur and swelling at the plantar aponeurosis level indicating a heel spur and plantar fasciitis. As the ALJ determined these medical conditions can cause pain,

-18-

however, there was evidence in the record indicating that Plaintiff's reporting of the pain was exaggerated. Dr. Chernesky wrote a letter that in his opinion, Plaintiff can only stand for thirty to forty-five (45) minutes due to Plaintiff's foot pain and Plaintiff had received injections, inserts and proper shoes with "no considerable results." (Tr. p. 264). Dr. Chernesky opined that Plaintiff could not work even part-time if the job involved standing on his feet.

The ALJ did not give great weight to Dr. Chernesky's opinion finding that his opinion was not consistent with the record as a whole, and Dr. Chernesky relied heavily on Plaintiff's subjective complaints. The ALJ noted that the other medical records showed that Plaintiff had no swelling; did not limp; used no assistive device; could walk for 1 mile; could squat, walk on toes and heels; could perform a tandem gate; had no difficulty standing from a sitting position; could walk comfortably around the examination room; could walk 100 feet in the office without limping; did not use a cane; and was doing well with exercise. Dr. Chernesky's opinion fails to support his conclusion that Plaintiff could stand for only thirty to forty-five minutes.  The ALJ determined that Dr. Chernesky's opinion is not supported by the record as a whole citing to other treating and non-treating physicians' opinions. As stated above, the ALJ supported his decision not to give great weight to Dr. Chernesky's opinion based on citations to the record. Further, in Dr. Krishnamurthy's residual functional capacity assessment, it was found that Plaintiff was capable of performing basic work activities at a light exertional level. (Tr. 468-75). The ALJ found this to be consistent with the medical evidence provided by Dr. Martinez, Plaintiff's primary cardiologist, who reported on more than one occasion following the onset date that Plaintiff had been doing exceptionally well from a functional standpoint with exercise and experienced no important limitations. (Tr. 317).

Plaintiff also asserts that the ALJ erred when he gave deference to Dr. Krishnamurthy's opinion over Dr. Chernesky's opinion. Dr. Krishnamurthy, the state medical examiner, did not examine the Plaintiff but did review medical files and determined that Plaintiff is able to stand/walk for six hours in an eight-hour work day and sit for six hours in an eight-hour work day. (Tr. 469). Although generally a treating physician's opinion is given more weight than a non-examining doctor, there are factors should be considered in determining the weight given to medical opinions. *See* 20 C.F.R. § 404.1527(c),(e); *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. App'x 869, 872-74 (11th Cir. 2001) (Finding the ALJ was justified in giving more weight to non-examining consultant's opinions over those of a treating physician). These factors include the evidence provided to support the opinion, the consistency of the opinion with the record as a whole, the examining and/or treating relationship, the doctors' specialty, and other factors. *See* 20 C.F.R. § 404.1527(c),(e). The ALJ found the opinion of Dr. Krishnamurthy to be more consistent with the record than Dr. Chernesky's opinion regarding Plaintiff's lack of complaints in many of his visits with Dr. Martinez as well as the several reports by Dr. Martinez stating that Plaintiff is doing exceptionally well, even following the transient ischemic attack. (Tr. 317, 319, 339, 391-92). Thus, the ALJ did not err in his determination that Dr. Krishnamurthy's opinion should be given deference over Dr. Chernesky's opinion as it was consistent with the record as a whole and supported by medical findings. *See* 20 C.F.R. § 404.1527(c), (e); SSR 96-6p.

Lastly, Plaintiff asserts that the ALJ failed to properly consider the respective specialties of Dr. Chernesky, Dr. Martinez, and Dr. Krishnamurthy. (Doc. 21 p. 8). The Commissioner has stated that an ALJ, in considering weight given to any medical opinion, must consider a number of factors including the specialties of the doctors of record. 20 C.F.R. § 404.1527(c); SSR 96-2p. Here, the ALJ has stated that all of the medical evidence was weighed in accordance with the

requirements of SSR 96-2p, which would encompass all of the appropriate factors. (Tr. 24). It is not evident in the record that there is any evidence to the contrary. While 20 C.F.R. 404.1527(c)(5) does state that more weight is generally given to the opinion of a specialist in a certain field, the opinion must still be found to be consistent with the rest of the record as a whole in order to be given such deference. § 404.1527(c)(5); SSR 96-6p. The ALJ found that Dr. Chernesky's opinion was not consistent with the record and supported this decision with substantial evidence from the record, therefore, the ALJ did not err in giving deference to Dr. Martinez's and Dr. Krishnamurthy's opinions over Dr. Chernesky's opinion. Therefore, the ALJ did not err in considering the respective specialties of the doctors whom provided medical evidence and opinions.

### III.      Conclusion

The ALJ's decision in the instant case is supported by substantial evidence. The ALJ did not err in his evaluation of Plaintiff's credibility and properly considered the amount of weight given to the medical evidence on record as well as Plaintiff's complaints of migraine headaches.

**IT IS HEREBY ORDERED:**

1)  The final decision of the Commissioner is **AFFIRMED** pursuant to 42 U.S.C. § 405(g) of the Social Security Act.

2)  The Clerk is directed to enter judgment for the Commissioner and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on January 13, 2014.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record

-21-